## 20771

John Paul ANDERSON, Respondent, v. William D. LEEKE, Director of the Department of Corrections for the State of South Carolina, and the State of South Carolina, Appellants.

(248 S. E. (2d) 120)

*Atty. Gen. Daniel R. McLeod* and *Asst. Attys. Gen. Emmet H. Clair* and *Katherine W. Hill,* Columbia, *for appellants.*

*Betty McBride Sloan,* Columbia, *for respondent.*

October 2, 1978.

LITTLEJOHN, Justice:

Respondent John Paul Anderson (Anderson) was convicted of murdering his wife by drowning in December 1965, and was sentenced to life imprisonment. His conviction was affirmed by this court in *State v. Anderson,* 253 S. C. 168, 169 S. E. (2d) 706 (1969). Subsequently, Anderson petitioned the United States District Court for South Carolina for a writ of *habeas corpus* on the ground that the prosecution had failed to disclose exculpatory evidence in violation of *Brady v. Maryland,* 373 U. S. 83, 83 S. Ct. 1194, 10 L. Ed. (2d) 215 (1963). The district court granted relief on this basis and an appeal was taken by the State to the United States Court of Appeals for the Fourth Circuit. That court vacated the order of the district court because of the failure of Anderson to exhaust state remedies. Thereafter, Anderson filed an application for post-conviction relief in the state circuit court. Following a hearing, the circuit court held that Anderson had been denied exculpatory material, in violation of *Brady v. Maryland, supra,* and directed the State to afford him a new trial. The State appeals.

The theory of the prosecution's case against Anderson was that he had held his wife under water until she drowned, in order that he could collect a $50,000.00 double-indemnity policy on her life, in which he was the beneficiary. It was in-

ferred by the prosecution that bruises found on the deceased's body were inflicted by Anderson during the course of holding her under water. Dr. Charles Webb, a pathologist who had performed an autopsy on the body, gave the following testimony on behalf of the State in regard to the time that the bruises were inflicted:

"Q. All right, do you have an opinion as to whether or not the bruises on the arms occurred before or after death?

A. After death—no, pardon me. Before death, definitely before death.

Q. The bruises on the arm were before death?
A. Yes."

On cross-examination by defense counsel, Dr. Webb testified as follows:

"Q. . . . [W]ere you able to tell on the evening of June the 19th with any degree of certainty how long previously this bruise, this faint bruise on the upper right arm from which you made the examination of the tissue, . . . how long prior to that it had occurred?

\* \* \* \* \*

A. . . . It is my opinion that this bruise occurred during the final twelve hours of life.

Q. But you couldn't pinpoint it any closer than that?
A. No, sir."

Anderson testified that the bruises were caused at an earlier time while he was teaching his wife to scuba dive.

The evidence alleged to have been suppressed was the autopsy report prepared by Dr. Webb. In his report, Dr. Webb stated that his examination of the bruises indicated that the force which inflicted the bruises "did not occur immediately before death." Anderson maintains that this evidence was favorable to his case and had a material bearing on the question of guilt, and that the suppression of this evidence by the prosecution was violative of due process and denied him a fair trial. *Brady v. Maryland, supra.* It is An-

derson's contention that this evidence would have enabled the defense to undermine the inference created by the prosecution's case that the bruises were inflicted during the alleged struggle which resulted in the deceased's death, and would have bolstered Anderson's explanation of when and how the bruises were caused.

The State argues that defense counsel was aware of the existence of the autopsy report, that it was on file in the coroner's office, and that it was therefore a matter of public record. Thus, the State contends that the autopsy report was equally available to the defense as to the prosecution, and that it is therefore not within the ambit of the holding in *Brady v. Maryland, supra.*

The heart of the United States Supreme Court's ruling in *Brady* is that:

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 83 S. Ct. at 1197.

Although not expressly stated in the opinion, we think it is implicit that the *Brady* rule applies only to favorable evidence which the prosecution has but which is *unavailable* to the defendant. *DeBerry v. Wolff,* 513 F. (2d) 1336 (8th Cir. 1975). This is consistent with the conclusion reached by the United States Court of Appeals for the Second Circuit in *United States v. Soblen,* 301 F. (2d) 236 (2nd Cir. 1962), *cert. den.* 370 U. S. 944, 82 S. Ct. 1585, 8 L. Ed. (2d) 810, where it was held that:

"[W]hile the prosecution has the duty to disclose, on its own initiative, exculpatory facts within its exclusive control, (citation omitted), it has no such burden when the facts are readily available to a diligent defender." 301 F. (2d) at 242.

*See, also, Ross v. Warden, Maryland Penitentiary,* 1 Md. App. 46, 227 A. (2d) 42 (1967); *Ward v. Turner,* 12 Utah

(2d) 310, 366 P. (2d) 72 (1961), *cert. den.* 371 U. S. 872, 83 S. Ct. 122, 9 L. Ed. (2d) 110.

A close reading of the *Brady* opinion supports the conclusion we reach. In explaining its holding, the Court stated:

"A prosecution that withholds evidence on demand of an accused which, *if made available,* would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant." 83 S. Ct. at 1197.

(Emphasis added.)

We think it is inferable from the foregoing statement that where evidence is equally available to the accused, the obligation on the part of the State to furnish such evidence to the accused is relieved.

It is apparent from the record that defense counsel was aware that an autopsy would be conducted and that an autopsy report would exist. In a postscript to a letter sent to the solicitor's office requesting the production of evidence favorable to the accused, defense counsel stated:

"Also, since the inquest will undoubtedly be delayed for some [time] because of Anderson's commitment to the State Hospital as proposed by you please make arrangements to have a copy of the autopsy report made available to us."

We agree with the lower court when it said that the solicitor acted in good faith. We also agree that a convicted person may be entitled to relief under *Brady* in spite of good faith. We think, however, that the trial judge erred in holding that the prosecuting attorney suppressed evidence within the meaning of *Brady* so as to result in the prejudice of Anderson's defense. *Brady* does not shift to the State the burden of gathering evidence for the defense. The very nature of defense counsel's request, as quoted above, shows that counsel anticipated an autopsy report and anticipated that the solicitor's office would receive a copy. There is no reason why counsel could not have pro-

cured the report from the doctor as easily as from the office of the solicitor.

Anderson was entitled to a fair trial, but not necessarily a satisfactory one. The basic question which we must ask is: Did the action of the solicitor deprive the accused of a fair trial?

In order to make this determination, we must evaluate the testimony of the doctor at the trial and his statement as contained in the autopsy report. We agree with the United States Court Judge when he said at the hearing before him that the testimony and the report are not inconsistent. The lower court stretches *Brady* too far in reaching its conclusion.

We are called upon 13 years after a conviction, and after the defendant has served at least a minimum of his sentence and has now been paroled, to restore him to the status of presumption of innocence and direct the State to hold a new trial. The courts of the states and of the United States give to a person accused of crime more protection against the possibility of erroneous conviction than any other system of courts on the face of the globe. The State must overcome many hurdles before an accused person is punished:

(1) the magistrate may refuse to issue a warrant;

(2) the magistrate may dismiss a case after a preliminary hearing;

(3) a grand jury may refuse to indict;

(4) the solicitor may *nolle pros;*

(5) the trial judge may direct a verdict;

(6) a petit jury may refuse to convict if only one juror has a reasonable doubt;

(7) the judge may set the verdict aside notwithstanding a verdict of the jury;

(8) the appellate court may reverse the conviction.

If the accused person can prevail at any one of these stages of a proceeding, he goes free and is unpunished. On the other

hand, the State must prevail at each of the eight stages before punishment is inflicted.

In addition to these many protections, the accused now has the right of application for post-conviction relief upon a proper showing. In almost any case a convicted person, given time for research, can come up with some sort of theory ostensibly warranting a new trial. A review of our opinion in the case of *State v. Anderson, supra,* will reflect that Anderson was well represented by competent counsel and that his defense was vigorously pursued.

Most of what Mr. Justice Harlan said in his separate opinion in *Mackey v. United States,* 401 U. S. 667, 91 S. Ct. 1160, 1179, 28 L. Ed. (2d) 404 (1971), with respect to collateral relief from a criminal conviction, is applicable here:

"Finality in the criminal law is an end which must always be kept in plain view. . . . At some point, the criminal process, if it is to function at all, must turn its attention from whether a man ought properly to be incarcerated to how he is to be treated once convicted. If law, criminal or otherwise, is worth having and enforcing, it must at some time provide a definitive answer to the question litigants present or else it never provides an answer at all. Surely it is an unpleasant task to strip a man of his freedom and subject him to institutional restraints. But this does not mean that in so doing, we should always be halting or tentative. No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved.

A rule of law that fails to take account of these finality interests would do more than subvert the criminal process itself. It would also seriously distort the very limited resources society has allocated to the criminal process. While men languish in jail, not uncommonly for over a year, await-

ing a first trial on their guilt or innocence, it is not easy to justify expending substantial quantities of the time and energies of judges, prosecutors, and defense lawyers litigating the validity under present law of criminal convictions that were perfectly free from error when made final. [citation omitted] This drain on society's resources is compounded by the fact that issuance of the *habeas* writ compels a State that wishes to continue enforcing its law against the successful petitioner to relitigate facts buried in the remote past through presentation of witnesses whose memories of the relevant events often have dimmed. This very act of trying stale facts may well, ironically, produce a second trial no more reliable as a matter of getting at the truth than the first."

The order of the lower court is reversed.

LEWIS, C. J., and NESS, RHODES and GREGORY, JJ., concur.