**John Paul ANDERSON, Petitioner,**

v.

**The STATE OF SOUTH CAROLINA and the Attorney General of the State of South Carolina, Respondents.**

**Civ. A. No. 80–862–8.**

United States District Court,
D. South Carolina,
Columbia Division.

June 28, 1982.

Betty McBride Sloan, Columbia, S. C., for petitioner.

Daniel R. McLeod, Atty. Gen., Columbia, S. C., for respondents.

BLATT, District Judge.

This habeas corpus action, brought pursuant to 28 U.S.C. § 2254, is before the court upon petitioner's and respondents' cross motions for summary judgment under Fed.R.Civ.Pro. 56. Petitioner challenges his conviction and subsequent incarceration by

South Carolina authorities as violative of the Constitution, laws, or treaties of the United States. The record includes a report and recommendation of the United States Magistrate made in accordance with the local rule of this District concerning reference of prisoner cases under 28 U.S.C. § 636(b)(1)(B). *In the Matter of Authority of United States Magistrates* Rule 3(a) (May 9, 1977) (local rule). *See, e.g., Wingo v. Wedding*, 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974); *Mitchell v. Beaubouef*, 581 F.2d 412 (5th Cir. 1978), *reh. denied*, 586 F.2d 842 (5th Cir. 1973), *cert. denied*, 441 U.S. 966, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979); *Schleicher v. Wyrick*, 529 F.2d 906 (8th Cir. 1976); *Bowman v. Bordenkircher*, 522 F.2d 209 (4th Cir. 1975). Under 28 U.S.C. § 636,

> [a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

28 U.S.C. § 636(b). *E.g., Blasingame v. Estelle*, 604 F.2d 893 (5th Cir. 1979); *Orand v. United States*, 602 F.2d 207 (9th Cir. 1979); *United States v. Raddatz*, 592 F.2d 976 (7th Cir. 1979). *See also* Rule 8(b)(4), Rules Governing Section 2254 Cases. Absent timely objection from a dissatisfied party, however, the scope of this court's review of the magistrate's report is more limited. *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980). *See* 28 U.S.C. § 636(b)(1)(B); *Bowman v. Bordenkircher*, 522 F.2d 209 (4th Cir. 1975). *Cf. United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) (failure to object to Magistrate's report constitutes a waiver of right to appeal from district court's order adopting that

report). Nonetheless, while the level of scrutiny entailed by the district court's review of the report and recommendation of the magistrate depends on whether objections thereto have been filed, *e.g., Webb v. Califano*, 468 F.Supp. 825 (E.D.Cal.1979), in either case "the district judge is free, after review, to accept, reject or modify any of the magistrate's findings or recommendations." *United States ex rel. Henderson v. Brierley*, 468 F.2d 1193 (3d Cir. 1972). *See Bowman v. Bordenkircher*, 522 F.2d 209 (4th Cir. 1975).

In the instant case, both petitioner[1] and respondents have advanced objections to certain portions of the magistrate's report, and petitioner has filed a reply[2] to respondents' objections. The contested findings and recommendations of the magistrate's report have been accorded the *de novo* review mandated by 28 U.S.C. § 636(b), Rule 8(b)(4) of the Rules Governing Section 2254 Cases, and the relevant case law, and the remainder of the record has been reviewed to assure that the magistrate's findings and recommendations are just and proper.

A careful review of the record indicates that the magistrate's report accurately and exhaustively[3] recounts the facts of this case, and that report is hereby incorporated into this order by specific reference thereto. Although the record created during the convoluted history of this case is extensive, the question presently before this court is fairly narrow. As correctly noted by the magistrate,

> [p]rior litigation has eliminated all justiciable federal issues the petitioner has advanced over the years except for the question of whether the petitioner's right to a fair trial was denied by the circumstances of the failure of his defense attorney in 1965 to obtain before trial a copy of the autopsy report prepared by the

---

1. Although petitioner is represented by counsel before this court, his objections were filed *pro se*.

2. Petitioner's reply was filed by his attorney, Betty McBride Sloan.

3. In addition to the factual narrative contained in his thirty-nine page report, the magistrate has also included summaries of all testimony from the trial of this case, as well as from the federal habeas corpus hearing. Report at 40–76, 77–83.

pathologist who testified at the trial, and copies of two reports compiled by investigating officers before trial.

Report at 3. Of course, this "question arises because of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny." *Id.* at 4, n.4.

Briefly, petitioner was convicted in December, 1965, of drowning his young bride, Brenda Lee Minton, in the ocean off Folly Beach, South Carolina, on June 19, 1965, ostensibly to collect a life insurance policy purchased during their courtship. While defense counsel argued that petitioner's wife had drowned accidentally after a scuba diving lesson, the prosecution contended that petitioner had purposefully murdered her by grasping her upper arms and holding her under water until she drowned. In support of their contention, the prosecution "repeatedly pointed to faint bruises on her arms after her body washed ashore .... " Report at 14. Testimony concerning these bruise marks was elicited from numerous witnesses and emphasized by the prosecution in its jury arguments.[4]

Moreover, "[t]he circumstantial evidence of the petitioner's guilt, including the motive for the slaying of his wife, was very strong." *Id.* at 12. Prior to his marriage to Brenda, petitioner had wooed a succession of young women by pretending that he was a wealthy and educated naval officer or businessman. According to the testimony of these girlfriends,[5] as well as certain insurance agents, petitioner "discussed marriage and insurance on the lives of most of these women with them, or with insurance agents, on the premise that large insurance policies for each of the women would enhance their future security together after

marriage to him." Report at 13. In December, 1964, prior to his engagement to Brenda Lee Minton, petitioner acquired a life insurance policy[6] on her life, naming first her parents, and, eventually, himself as beneficiary.

In addition to the large body of circumstantial evidence marshalled by the prosecution, petitioner's trial counsel faced other serious hurdles in presenting his defense. As the magistrate charitably observes in his report, "petitioner's testimony contained several internal inconsistencies ... and was lacking in credibility in several particulars .... " Report at 15.

> It would be difficult for any factfinder to credit the petitioner's accounts of his free-wheeling love affairs, even after his marriage, his strained explanation of the financial arrangement he worked out for the father of Brenda's unborn child ... to pay for the financial burden Brenda had incurred or expected to incur later because of the pregnancy, and his wholly unconvincing explanation of why he admittedly asked some of his friends after Brenda's death to line up "Tillies" (his term for witnesses willing to testify falsely for a fee) to give him an alibi of sorts by perjured testimony.

*Id.* at 15–16 (footnotes omitted).

Petitioner's trial was quite lengthy, involving more than forty witnesses and numerous exhibits over the course of seven days. Not surprisingly, the jury's deliberations were also lengthy, eventually culminating in a guilty verdict to the murder charge. This conviction was subsequently affirmed by the South Carolina Supreme Court. *State v. Anderson*, 253 S.C. 168, 169

---

**4.** The predominant emphasis placed by the prosecution on these bruise marks is clearly demonstrated by the testimony of at least six different witnesses, as well as repeated references to the marks in jury arguments. *See* notes 28–34 and accompanying text, *supra*.

**5.** Ellen Ketcham, Janice Hill, Mary Jane Kuntz, and Cathy Hildebrand testified for the prosecution concerning their relationships with petitioner.

**6.** According to the testimony of Samuel Springer, an agent with the John Hancock Mutual Life Insurance Company, petitioner purchased a fifty-thousand dollar life insurance policy in December, 1964, which contained a double indemnity provision for accidental death. Petitioner became the designated beneficiary under the policy on April 20, 1965. The only payment made on the policy was the semi-annual premium paid at the time of purchase; petitioner's wife's death occurred while the policy was in its grace period, but before it would have lapsed for nonpayment of premium.

S.E.2d 706 (1969).[7] On February 12, 1969, petitioner filed a petition for federal habeas corpus relief, which was docketed as Civil Action No. 69–137 and assigned to the Honorable Robert W. Hemphill, United States District Judge. At the time this petition was filed, the South Carolina Supreme Court had not yet decided his direct appeal, and Judge Hemphill therefore dismissed the petition for failure to exhaust the available state remedies. Petitioner appealed this dismissal to the Fourth Circuit Court of Appeals; during the course of this appeal, the South Carolina Supreme Court rejected petitioner's direct appeal and the Fourth Circuit consequently remanded his federal habeas corpus petition to the district court. *Anderson v. State of South Carolina*, No. 13360 (4th Cir. April 7, 1970).

Subsequent to remand, petitioner submitted a *pro se*[8] motion to disqualify Judge Hemphill, which resulted in the petition being reassigned to this court. An evidentiary hearing was conducted beginning August 23, 1973, focusing on the grounds for relief originally raised in the petition.[9] Although the court denied relief on all of these grounds, the latent *Brady* issue concerning the autopsy report and investigative notes became apparent during the course of this hearing. The court directed that petitioner's counsel be given access to all available prosecutorial files, and the hearing was reconvened on February 1, 1974; after hearing arguments on the *Brady* issue, this court issued oral findings of facts and conclusions of law and granted petitioner relief on this issue. On appeal, the Fourth Circuit affirmed the district court's dismissal of petitioner's original grounds for relief, but vacated the relief granted on the *Brady* issue since that issue had only arisen during the course of the federal proceeding and had not been presented to the South Carolina courts. *Anderson v. State of South Carolina*, No. 74–1225 (4th Cir. September 27, 1974).

Consequently, petitioner filed a petition for a writ of habeas corpus in the Court of Common Pleas for the Ninth Judicial Circuit, which was treated as an application under the Uniform Post-Conviction Procedure Act, S.C. Code Ann. §§ 17–27–10 *et seq.* (1976). In an order filed July 8, 1977, the Honorable Klyde Robinson, Resident Judge of the Ninth Judicial Circuit, granted petitioner post-conviction relief based on *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, the South Carolina Supreme Court reversed this order, holding that the prosecutor's failure to make a copy of the autopsy report available to defense counsel did not constitute a violation of *Brady* because the document was a public record equally available to both the prosecution and defense through the Charleston County Coroner's office. *Anderson v. Leeke*, 271 S.C. 435, 248 S.E.2d 120 (1978).

---

7. This order was filed on July 22, 1969. The South Carolina Supreme Court had earlier rejected petitioner's request for habeas corpus relief based on certain pretrial matters. *Anderson v. State*, 252 S.C. 650, 168 S.E.2d 305 (1969).

8. Although petitioner was represented by counsel at this time, Mrs. Sloan neither participated in nor supported the motion.

9. The grounds for relief initially advanced in his petition were:
    (1) South Carolina lacked jurisdiction over the alleged homicide because the death occurred outside the limit of its territorial jurisdiction and inside the territorial jurisdiction of the United States;
    (2) The petitioner was deprived of a fair trial because of widespread pretrial publicity concerning the case;
    (3) Navy and civil officers conducted unconsented searches of the petitioner's personal effects at his home, in his quarters where he was stationed, and in the U. S. Naval Hospital where he was confined after his wife's death but before he was charged with the crime, and illegally entered his bank safe-deposit box;
    (4) A Navy intelligence officer and a civil police officer conducted an unconsented interview with the petitioner, which was recorded, three days after his wife died, and solicited an unconsented polygraph examination of the petitioner;
    (5) The presiding judge (Judge Singletary) gave the jury an inappropriate *Allen* charge.
    Report at 5–6.

**730**

Subsequent to this decision, petitioner renewed his collateral attack of the 1965 conviction in this court under 28 U.S.C. § 2254. In the present petition, petitioner asserts the following grounds for relief:

(1) The prosecution withheld knowingly and willfully from the defense crucial evidence which consisted of the autopsy report, and investigation reports of officers which included references to the autopsy report and an interview of a witness (Mrs. John Ohlandt), who allegedly testified at variance from what officers quoted her as saying when she was initially interviewed;

(2) The prosecution elicited testimony and photographs (of the victim's body) from investigating officers to support the prosecution's theory of how the death occurred, when the prosecution witnesses knew of undisclosed exculpatory information contained in their investigative reports;

(3) Denial of due process caused by unnecessary delays in obtaining transcripts and in granting hearings, both in the state courts and here;

(4) All grounds previously raised here in Civil Action 69–137 which were denied, the denials of which were thereafter affirmed by the United States Court of Appeals, itemized as:

(i) Illegal search and seizure of certain personal effects while petitioner was confined in the U. S. Naval Hospital;

(ii) The lack of a preliminary hearing;

(iii) Lack of jurisdiction because the death of the drowning victim occurred outside the jurisdiction of the State of South Carolina;

(iv) Unconscionable delays by both state and federal courts in considering petitioner's post-conviction cases; [10]

(v) Denial of right to counsel caused by state and federal interference in the attorney-client relationship between attorney Chipley and petitioner;

(vi) Unfair *Allen* charge during trial;

(vii) Prejudicial pretrial and post-trial publicity.

Report at 9–10. Of these grounds, only grounds (1) and (2) are pertinent here. The items enumerated in ground (4) have previously been considered and rejected by this court, with that dismissal being affirmed by the Fourth Circuit; petitioner's reply suggests that ground (4) is included merely to preserve those issues for possible review by the Supreme Court. Additionally, ground (3) has never been presented to the South Carolina courts and petitioner has therefore failed to exhaust his available state remedies.[11] Thus, as previously stated, the only

---

**10.** Petitioner's list of "grounds previously raised ... in Civil Action 69–137" is more extensive than the original petition would suggest. *See* note 9, *supra.*

**11.** The magistrate's report and recommendation in this case preceded the Supreme Court's recent pronouncement in *Rose v. Lundy,* —— U.S. ——, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), which requires that "a district court must dismiss habeas petitions containing both unexhausted and exhausted claims." *Id.* at ——, 102 S.Ct. at 1205. Cases from this circuit in the brief period since *Rose* have made it clear that this court must apply the law as it exists at the time of the decision, and the effect of *Rose* on the ostensibly "mixed" petition advanced here must therefore be considered. *E.g., Shweinsberg v. Galley,* 681 F.2d 816 (4th Cir. 1982); *Canty v. Cherry,* 679 F.2d 878 (4th Cir. 1982); *Wilson v. Turner,* 679 F.2d 892 (4th Cir. 1982); *Cox v. Hurt,* 681 F.2d 813 (4th Cir. 1982).

After careful consideration, this court is firmly of the opinion that *Rose v. Lundy* does not invariably mandate dismissal of all mixed habeas petitions. The holding of *Rose* is not inconsistent with earlier case law establishing certain exceptions to the exhaustion doctrine which allow "federal courts to treat claims technically unexhausted." *Galtieri v. Wainwright,* 582 F.2d 348 (5th Cir. 1978) (appellate court considered merits of *Brady* claim despite presence of other unexhausted claims). *See, e.g., Grooms v. Wainwright,* 610 F.2d 344 (5th Cir. 1980), *cert. denied,* 445 U.S. 953, 100 S.Ct. 1605, 63 L.Ed.2d 789 (1980) (waiver of exhaustion requirement by State); *Stanley v. Wainwright,* 604 F.2d 379 (5th Cir. 1979), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980) (unexhausted claim raised by copetitioner); *Simmons v. Wainwright,* 585 F.2d 95 (5th Cir. 1978) (unexhausted claim not of "constitutional dimension"); *Galtieri v. Wainwright,* 582 F.2d 348 (5th Cir. 1978), *rehearing denied,* 587 F.2d 508 (5th Cir. 1978) (undue delay by State); *Jones v. Shell,* 572 F.2d 1278 (8th Cir. 1978) (intentional delay by State); *Patterson v. Leeke,* 556 F.2d 1168 (4th Cir.

question before this court is whether the petitioner's right to a fair trial was denied by the prosecution's failure to make the autopsy report and investigative notes available to petitioner's trial counsel.

Within the factual and procedural context provided by this brief review of the record, it becomes incumbent upon this court to examine the facts germane to the *Brady* issue in greater detail. A few days after petitioner was charged with his wife's murder on July 30, 1965, one of his defense attorneys wrote the solicitor requesting any material "which might be favorable to Anderson." Although the coroner's inquest had been delayed pending petitioner's competency examination, the letter also specifically requested that "a copy of the autopsy report [be] made available to us." Unfortunately, this "request ... was thereafter overlooked by both the Solicitor and the petitioner's attorneys." Report at 18. In addition to this letter, a formal *Brady* motion was filed on November 24, 1965. The autopsy report at issue, in referring to the bruises on the decedent's arms, states:

> Sections of skin and subcutaneous tissue from the region of the bruise on the right arm show small areas of interstitial hemorrhage and related tissue reaction. This ... feature indicates that injury did not occur immediately before death.

Similarly, the investigative notes of Chief Bunch and Officer Sprague also contain

references to the bruises reflecting hearsay opinions that the marks were not inflicted immediately before death.

As previously indicated, the prosecution contended that the bruises were caused by petitioner forcefully grasping decedent's upper arms and holding her under water until she drowned. "The whole theory of the prosecution, as stated in the indictment itself, was that petitioner with hands and arms forcibly submerged the victim in the surf, and the bruises on the arms of the victim were highlighted both by the proof and in closing argument." Report at 21 n.39. Without question, the material at issue here falls within the ambit of *Brady v. Maryland,* particularly in light of this fundamental contention of the prosecution.

A detailed analysis of *Brady* questions decided by higher federal courts since this court entered its findings and conclusions in 1974 is unnecessary. In *Chavis v. State of North Carolina,* 637 F.2d 213 (4th Cir. 1980), the Fourth Circuit Court of Appeals recapitulated the teaching of *Agurs,* which had been summarized earlier in *United States v. Sutton,* 542 F.2d 1239 (4th Cir. 1976). That court stated:

> "In *United States v. Agurs* ... the *Brady* rule was both refined and expanded. There, the court said that under *Brady* the suppression of exculpatory evidence constitutes a denial of due process vitiating a conviction in three distinct types of

1977), *cert. denied,* 434 U.S. 929, 98 S.Ct. 414, 54 L.Ed.2d 289 (1977) (state post-conviction procedure ineffective). Indeed, the Fourth Circuit Court of Appeals has recently suggested that *Rose* does not necessitate the dismissal of a mixed petition if the district court determines that the unexhausted claims did not require exhaustion "because the claims were frivolous ...." *Shweinsberg v. Galley,* 681 F.2d at 816, at 3 (4th Cir. May 28, 1982). *See Jenkins v. Fitzberger,* 440 F.2d 1188 (4th Cir. 1971). In the present case, this court specifically finds that ground (3) of the petition is patently frivolous and that the State has waived any failure by petitioner to exhaust all his claims. *Id.* at 1189.

Moreover, aside from these exceptions to the exhaustion doctrine, this court strongly feels that *Rose v. Lundy* does not require dismissal here because of the unusual and extraordinary circumstances surrounding this case, not the

least of which being its arduous, thirteen-year journey through the federal and state judicial systems. *See Stinson v. State of Alabama,* 585 F.2d 748 (5th Cir. 1978). Since petitioner "can always amend the petition to delete the unexhausted claims, rather than returning to state court to exhaust all of his claim," *Rose v. Lundy,* —— U.S. at ——, 102 S.Ct. at 1204, it would be ludicrous to suppose that petitioner would take some other approach here in light of this court's favorable decision concerning the admittedly exhausted *Brady* claim. To further delay final resolution of the petition on this specious ground would truly elevate form over substance, increasing the delays already occasioned by the exhaustion doctrine during the tortured history of this case and creating the very kind of "piecemeal litigation" the doctrine was designed to prevent. *See* —— U.S. at ——, 102 S.Ct. at 1205.

situations: (1) where the prosecution's case includes perjured testimony, the prosecution knew or should have known of the perjury but failed to disclose the fact, and there is any reasonable likelihood that the false testimony could have affected the judgment of the jury; (2) where the defense has requested but has been denied the production of specific evidence material to the issue of guilt; and (3) where the defense has either made no request or has made only a general request for all exculpatory evidence but the prosecution suppresses evidence of sufficient probative value to create a reasonable doubt of the guilt of the accused where none theretofore existed ... As is obvious, *Agurs* directs a less rigorous standard of materiality to be applied in order for a reviewing court to conclude that due process was denied where defense counsel has made a timely request for specific exculpatory material than where only a general request, or no request, was made. In the former case, the conclusion that due process was denied follows if the undisclosed evidence 'might have affected the outcome of the defendant's trial.'"

637 F.2d at 222–23. The court also cited two cases in other circuits that were illustrative "of the lower threshold of materiality for specifically requested exculpatory material," and concluded that such cases effectively hold that a new trial is required "if there was a 'reasonable possibility' that the undisclosed evidence would have materially affected the verdict." *Id.* at 223.

The parties now before this court do not agree concerning which of the three situations discussed in *Agurs* apply in this case. Respondents argue that nothing in the pathologist's testimony was inconsistent with his report of autopsy insofar as the age of the bruises on the body of the drowning victim was concerned. Petitioner argues that the availability of the autopsy report before trial would have enabled petitioner's attorneys to more effectively cross-examine the pathologist "to confirm that the bruise marks were made a considerable period of time before the date of death." Petitioner's Reply at 8. Petitioner also argues strongly that it has never been shown that the autopsy report was in fact a public record under South Carolina statutes.[12]

*Agurs* is not very helpful in weighing these opposing contentions. The present case is complicated because petitioner's attorneys, from all appearances, did not insist upon their request for access to a copy of the autopsy report, and the solicitor, from all appearances, lost sight of the request after it was made. Certainly, if the solicitor was mindful at trial that the report would have tended to diminish the strength of his case, based as strongly as it was on the presence of the telltale bruises on the victim's arms, he had a duty to disclose the report, irrespective of whether it had been requested. However, this does not appear to be the case here because the solicitor's good faith has never been brought into question.[13] *Agurs* teaches that if the solicitor had any doubts concerning the right of petitioner's attorneys to see the report and the officers' statements, he should have released these items, *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976), or he should have requested Judge Singletary to rule on the question of whether the items properly constituted *Brady* material. *Id.* at 106, 96 S.Ct. at 2398. The only possible basis upon which the omissions could be juridically excused now would be to conclude that the oversights were errors that were harmless beyond a reasonable doubt under the "seldom if ever" exception mentioned by way of dictum in *Agurs*.[14] The questions concern-

---

**12.** This court earlier stated that there is a presumption that a copy of the autopsy report was in the Coroner's possession. Tr.Rec. at 199, 11. 4-5.

**13.** Nonetheless, while the solicitor's lack of good faith in neglecting to provide defense counsel with the report has not been shown, the operation of *Brady* is not contingent on such a showing. *See* notes 20–21 and accompanying text, *supra*.

**14.** "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *Id.* 427 U.S. at 106, 96 S.Ct. at 2399. This language

ing whether the errors at trial in 1965 were harmless are not as easy to resolve as the parties now respectively urge when the entire record is reviewed in retrospect.

Mention has been made of the patent discrepancy existing between the trial testimony of the pathologist concerning when the victim's arms were bruised and the hearsay comments in the officers' notes that someone who saw the body during the autopsy said the bruises were a few days old. Since the pathologist took care to point out that he did not examine microscopic slides of tissues until several days after he performed the actual autopsy on June 19, 1965, comments overheard by the officers in the examination room, or reported to them later by someone who was there, might well be considered to be "preliminary, challenged, or speculative information." *Id.* at 109, n.16, 96 S.Ct. at 2400, n.16, *quoting Giles v. Maryland,* 386 U.S. 66, 98, 87 S.Ct. 793, 809, 17 L.Ed.2d 737 (1967). It is not possible at this late date, however, to say with any degree of certainty what success petitioner's defense attorneys might have had if the pathologist, the coroner, and officers Bunch and Sprague had been cross-examined with the benefit of the autopsy report and the officers' written reports dated the day of the drowning. The attorneys now believe they could "have torn up" [15] the coroner and three officers who gave testimony about the bruise marks on the victim's body, that they might have managed to exclude photographs of the victim from evidence, and that they could have used for possible impeachment the allegedly contemporaneous statement Mrs. Ohlandt gave officers that she saw the victim on the plastic raft after petitioner left her, but such retrospective analysis does not take into account the very real possibility that these apparent inconsistencies might have been explained by these witnesses. On the static trial record, however, given the pointed and repeated efforts of the prosecution to embed in the minds of the jurors the existence of the bruises on the victim's arms as mute but tangible evidence that she was forcibly held underwater until she lost consciousness, it is equally hard to discount the possibility that the defense attorneys, had they been armed with the undelivered reports, might very well have been able to utilize the seeming inconsistencies to great advantage in counterbalancing the evidence concerning the bruises.

When it is kept in mind that the trial jury deliberated over thirty-two hours before reaching its verdict, even though it heard no testimony concerning when the victim's arms were bruised other than the pathologist's comment that the bruises occurred within twelve hours of death, it is understandable that both trial judges who have found for the petitioner believed that disclosure of the undelivered autopsy report might have tipped the scales of justice towards him.

■ Proper respect for the opinion of this state's highest court, which has always been one of this court's preeminent motivations, requires a re-evaluation of the findings and conclusions reached in the earlier habeas corpus cases, and although this court may ordinarily defer to a state court's findings,[16] federal constitutional principles must be applied by the federal judiciary under *Townsend v. Sain,* 372 U.S. 293, 318, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963). The South Carolina Supreme Court concluded that *Brady* is inapplicable to petitioner's case because the autopsy report was a public record, available from a neutral source under the *Agurs* analogy,[17] and that the

---

contains a faint implication that a *Brady* default after a specific request might be waived under rare circumstances, but it will not support a *Wainwright v. Sykes* form of waiver.

**15.** Hrg.Tr. at 278, 11. 4–20.

**16.** This case is unusual in that a state appellate court has partially disagreed with this federal trial court's findings, whereas in ordinary § 2254 cases a federal court has to determine whether a state court's findings were reliable after an adequate hearing.

**17.** However, the South Carolina Supreme Court opinion did not cite *Agurs,* citing instead *United States v. Soblen,* 301 F.2d 236 (2d Cir. 1962), *cert. denied,* 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962), *DeBerry v. Wolff,* 513 F.2d 1336 (8th Cir. 1975), and two state cases

availability of the pathologist to give testimony in direct and cross-examination, which testimony was not inconsistent with the autopsy report, resulted in a fair trial for the petitioner. The opinion dealt only with the autopsy report and no mention was made of the officers' investigative reports made on the evening of the victim's death, probably because Judge Robinson had not specifically referred to such reports in his order.[18]

When the South Carolina Supreme Court decided the petitioner's case, *Chavis v. State of North Carolina*, 637 F.2d 213 (4th Cir. 1980), had not been decided. *Chavis* now makes it clear that "there is no general 'public records' exception to the *Brady* rule," 637 F.2d at 225, although it cites a case from the District of Columbia holding that *Brady* is satisfied if a prosecutory who is asked for a public record discloses to a defense attorney how to obtain such record. This court must, of course, with all due deference to the South Carolina Supreme Court, apply habeas corpus law as expressed by higher federal courts when there exists a conflict between that law and the view articulated by the state courts. Therefore, there remains only for this court to reevaluate the voluminous record and to apply *Agurs* and *Chavis* to its findings.

It is manifestly too late for the petitioner to be retried for the death of his wife, for it would be astounding if the prosecution could reassemble its case in chief so long after it has been dismantled. Therefore, in view of the obvious strain a case such as

this places on the principles of comity that are implicated when a federal trial court is asked to reverse a final conviction in the State where the federal court also sits, this record must be very carefully analyzed so as to establish (1) whether one or more *Brady* violations occurred before or during petitioner's trial; (2) if so, which type of violation occurred among the three situations delineated in *Agurs*; and (3) whether the petitioner has prevailed in showing that the withheld material, if disclosed, would have effected the trial sufficiently to justify vacating the conviction.[19]

Despite respondents' earnest contentions to the contrary and with all deference due the South Carolina Supreme Court, the thirteen words that comprise the penultimate sentence of Dr. Charles M. Webb's histological protocol,[20] particularly in the context of the State's proof against petitioner, constituted *Brady* material. The fact that Dr. Webb testified does not alter that inescapable conclusion, because he did not articulate during his testimony the medical indication he noted in the report. While, in the abstract, it is possible to harmonize the autopsy report with Dr. Webb's opinion testimony that the bruises were sustained within twelve hours of death, more of the trial record than Dr. Webb's testimony must be utilized to properly evaluate under *Brady* the effect on petitioner's trial of the unavailability of the report to his defense attorney since so much had been made of the presence of the bruises on the victim's arms both in evidence and in final

---

from Maryland and Utah. The Maryland case was remanded for a hearing, but it contains dictum that a prosecutor has no duty to disclose evidence available to a defendant. The Utah case, decided before *Brady*, held that undisclosed medical evidence probably would not have resulted in the acquittal of an accused rapist who also committed sodomy.

18. Judge Robinson referred to the fact that officers testified concerning the bruises while having knowledge of the autopsy report, but he did not treat the written officers' reports as *Brady* material that had been withheld.

19. The Utah case cited by the South Carolina Supreme Court, *Ward v. Turner*, 12 Utah 2d

310, 366 P.2d 72 (1961), *cert. denied*, 371 U.S. 872, 83 S.Ct. 122, 9 L.Ed.2d 110 (1962), although decided before *Brady*, contains a persuasive argument in support of the proposition that one who seeks post-conviction relief long after a conviction should carry a heavier burden of persuasion before prevailing than one who more or less contemporaneously with his conviction seeks a new trial on after-discovered evidence.

20. "This latter feature [interstitial hemorrhage and related tissue reaction] indicates that the injury did not occur immediately before death." Tr.Rec. at 240.

argument. While the unavailability of the autopsy report at trial, viewed in isolation, might be rationalized as mere harmless error, the magnitude of possible error is enhanced when the photographs of the victim's body and the testimony of five witnesses about bruises on the victim's arms are considered, along with repeated references to the bruises in closing argument to the jury.

Notwithstanding the unfortunate and unexplained failure of petitioner's attorneys to actively pursue their request, the autopsy report, which was material and relevant, was specifically requested. The report was not delivered to them and they were not given any reason why it was not provided. *Chavis* outlines the consequence of the prosecutor's inadvertent oversight:

> As is obvious, *Agurs* directs a less rigorous standard of materiality to be applied in order for a reviewing court to conclude that due process was denied where defense counsel has made a timely request for specific exculpatory material than where only a general request, or no request, was made. In the former case, the conclusion that due process was denied follows if the undisclosed evidence "might have affected the outcome of the defendant's trial." *Id.* 427 U.S. at 105, 96 S.Ct. at 2398.

637 F.2d 213, 223. This court has earlier made just such a determination. While nothing in the record has changed since then, the court must nonetheless re-evaluate the case in the light of *Agurs* and *Chavis*, bearing in mind the closeness of the question involved.[21]

If the petitioner did not kill his wife, a grave miscarriage of justice has occurred. If he did commit the crime, an equally offensive miscarriage of justice will be the result[22] if this court is required to vacate his conviction because the prosecutor erroneously assumed a prerogative that was exclusively Judge Singletary's to exercise before the trial. The "overriding concern with the justice of the finding of guilt" that the Supreme Court emphasized in determining the materiality of possibly exculpatory matters, *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2401, was expressed in the context of exculpatory matter possessed by a prosecutor when no *Brady* request or an overly general request has been made. It can be plausibly argued that a specific *Brady* request made and then apparently abandoned falls within the scope of that category in *Brady*. If so considered, the materiality of the autopsy report in petitioner's trial must be evaluated in the context of the entire record, and "if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2402. "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 112–113, 96 S.Ct. at 2402.

In the petitioner's case, the jury's verdict met the constitutional standard of rationality set out in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). There was undisputed evidence about the scuba lesson, but no reasonable explanation was offered by testimony by the defense for the presence of the bruise marks, other than petitioner's accounts of how he held

---

21. If viewed apart from the autopsy report, the investigation reports of officers Bunch and Sprague would not have affected the outcome of the trial, in all probability, because the cryptic reports were obviously made in the haste of the flurry of interviews which occurred right after the victim's death. However, the reports must be viewed in tandem with the autopsy report, and when so viewed, the failure of the petitioner's attorneys to see these items becomes more significant under *Brady*. The comment attributed to Mrs. Ohlandt probably lacks great significance, see *Agurs*, 427 U.S. at 109–110, 96 S.Ct. at 2400–2401, but hearsay comments about the age of the bruises were material here.

22. The petitioner served about eleven years in prison before being paroled, so if he prevails in his efforts to have his conviction set aside, even if he was guilty, he has not escaped punishment.

the victim while she practiced breathing exercises using the air tank strapped to her back. There was the casual, almost indifferent attitude of petitioner after he left his highly insured bride of less than three months in deep water so he could run an errand and drink beer with friends on another beach several miles away. There was the obviously low degree of credibility in petitioner's various and sometimes internally contradictory accounts of his personal and business affairs, manifested by his admitted deception of friends and even his own attorneys and his conceded efforts to suborn perjury at his trial. There is also an indication, which he denies, that he telephoned Cathy Hildebrand only one or two days before his wife drowned in June to forecast that he would have $100,000.00 in about three months.[23] In substance, both the crime and the motive were clearly established by strong circumstantial evidence.

Against this backdrop, the withheld *Brady* material [24] must be overlaid to determine whether it creates "a reasonable doubt that did not otherwise exist" *Agurs*, 427 U.S. at 104, 96 S.Ct. at 2397–2398, or, if the specific request for the autopsy report was not constructively waived by its abandonment and the testimony of the pathologist, whether "the suppressed evidence might have affected the outcome of the trial." *Id.* In visualizing the impact this material might have had on the jury, it must be considered both in the context of the trial testimony and with a realization of the circumstances under which each written comment was made. Of all the scriveners, only Dr. Webb was a scientist, with a scientist's objectivity in recording his findings. Thus, his recorded observation that the small bruise on the victim's right arm, the only one microscopically examined, "indicates that the injury

did not occur immediately before death[,]" is fully consistent with his expressed unwillingness at trial to fix the time of injury any closer than "during the final twelve hours of life." However, this court doubts that the doctor could have harmonized his written histological protocol with his oral testimony to the satisfaction of the jury if the petitioner's attorneys had received the autopsy report before trial, and had questioned him about the bruise more closely.

The reference by Chief Bunch to the Ohlandts reads: "Persons in the area reported seeing the girl and raft disappear out of sight" after the male "came out of the water" to drop his diving tank on the beach "leaving the girl on the raft." When it is recalled that this was a note of a telephoned report to the police from Mrs. Ohlandt, the cryptic account that merely condensed a citizen's report fades into insignificance as a *Brady* exculpatory comment that affected Mrs. Ohlandt's credibility adversely.

The officers' references to bruises on the victim are somewhat repetitious. Officer Sprague noted on June 19, 1965, the date of death, "Vic. Brenda has a bruise on both arms and on chest. Coroner received word from the Emergency Room that these marks are a few days old." [25] This same statement was repeated in an apparently identical report that was retyped for reasons not revealed in the record.[26] A "complaint" bearing Chief Bunch's signature, reflecting notification that the victim's body had washed ashore, and later aspects of the initial stages of the investigation of the drowning death, states in part: "Autopsy report shows girl drowned. Marks on body according to doctors and coroner who exam-

---

**23.** The Navy investigation file contains a copy of the petitioner's telephone bill for the period ending June 20, 1965. On June 18, 1965, two calls were made to Greenville, North Carolina. One of these calls went to 758–2331, which was Cathy's number. See Tr. at 705, 708.

**24.** The suppressed material appears at Tr.Rec. 233–241, specifically page 234, lines 10–12; page 235, last three lines before date; page 236, top report, lines 5–6 under details; page 237,

lines 11–13 of typed portion; and page 240, lines 5–6.

**25.** Tr.Rec. at 234.

**26.** Tr.Rec. at 233–234 is the same report as Tr.Rec. at 235, except the obvious erroneous date on line 2 of the details on Tr.Rec. at 233 is corrected on Tr.Rec. at 235.

ined her, have been on body for several days, or less." [27]

Certainly, a reasonable doubt of whether the petitioner received a fair trial, if not a reasonable doubt of guilt, begins to form when the foregoing comments are compared with the testimony at trial of Chief Bunch,[28] officer Posser,[29] the private citizen who dragged the body from the surf,[30] Coroner Cauthen,[31] officer Sprague,[32] and officer West,[33] and the closing argument of the prosecutor is reviewed for his repeated references to the bruises.[34] Whether because of guile or because they were later assured that the pathologist had narrowed the time the bruises occurred to within twelve hours of death, Chief Bunch, the Coroner, officer Sprague, and possibly officer West, allowed a very certain impression to be created at trial that they were merely explaining what they observed or heard unaffected by any information they may have obtained that would have tended to cast doubt upon the thrust of the prosecution's proof about how the petitioner brought about his wife's death. This is not necessarily an instance such as that Judge Craven discussed in *United States v. Sutton*, 542 F.2d 1239, 1243 (4th Cir. 1976), where the prosecution "allowed a false impression to be created at trial when the truth would have directly impugned the veracity of its key wit-

ness[es]," for the State's witnesses may have had the age of the victim's bruises determined by the time they testified six months after the autopsy was performed. There can be no realistic doubt expressed, however, that the officers' hearsay comments in their reports might have had some effect on the jury's assessment of the credibility of the succession of witnesses (other than Blanchett and Dr. Webb) who described the bruises on the victim's arms. The bruises were critical to the State's case, and any evidence that would have caused the jury to have a reasonable doubt that the victim's arms were bruised when the petitioner forcibly immersed her on June 19, 1965, "might have affected the outcome of the trial," to quote Justice Stevens in *Agurs*, 427 U.S. at 104, 96 S.Ct. at 2398.

A hearing now to explore what the witnesses would have said at trial, if then confronted with prior seemingly conflicting hearsay pronouncements, would be as futile as a retrial now of the petitioner for the 1965 death of his wife. There is a suggestion in the record that Coroner Cauthen is deceased [35] and it would be next to impossible for persons who testified in 1965 to now recall, sixteen years later, when, if ever before trial, they learned of Dr. Webb's conclusion that the bruise on the victim's right arm occurred within twelve hours of

27. Tr.Rec. at 237, 11. 11–13. Unless the autopsy report was done in segments, it is not clear how Chief Bunch could have seen it on June 19, because Dr. Webb testified he did not receive microscopic slides back until a week or two later. The officer may have been referring to notes made during the autopsy, but the only reference in the report to the age of the bruises was based on this histological report of tissue and skin taken only from the victim's right arm.

28. Tr. at 259–260, 276–277.

29. Tr. at 297–299.

30. Tr. at 307–308 (James T. Blanchett's testimony).

31. Tr. at 318.

32. Tr. at 400.

33. Tr. at 834–835. Detective West testified that the petitioner told him the victim had no

bruises on her arms when they went into the surf.

34. In his opening argument, in addition to publishing the words of the indictment which charged that petitioner did "push, hold and immerse" his wife under water until she drowned, the solicitor made several other direct and indirect references to bruise marks on the body of the decedent. See Tr. at 1394, 11. 26 and 31; *id.* at 1395, 11. 15, 24–25; *id.* at 1396, 11. 1–2, and 6; *id.* at 1399, 11. 15–16, 24; *id.* at 1402, 1. 26. The defense in argument referred to the bruise marks directly or indirectly at Tr. at 1470, 11. 26–31; *id.* at 1471, 11. 15–33; *id.* at 1473–1474; *id.* at 1475, 11. 1–19; *id.* at 1476, 11. 6–7. In his reply argument, the solicitor made further references to the bruises at Tr. at 1489, 11. 27–32; *id.* at 1490, 11. 1–12; *id.* at 1496, 1. 6.

35. Hrg.Tr. at 393, 11. 16–21.

the time she died, which the trial record fixes at sometime between 10:00 a. m. and noon on June 19, 1965. Memories are not so reliable that such clarification can be expected, even if every witness testified in absolute candor.

On the basis of the voluminous record, containing numerous imponderables which make the court's decision a most difficult one, the application of *Brady, Agurs,* and *Chavis* would appear to justify granting relief to petitioner. In the absence of a higher court's establishment of such a concept, it must be assumed that a specific *Brady* request for material and relevant evidence cannot be later waived by inaction. Under *Agurs* and *Chavis,* therefore, the tests of materiality of the autopsy report and the officers' reports are whether, as to the former, a timely delivery of the report "might have affected the outcome" of the petitioner's trial, and as to the latter items, whether a timely delivery of the reports of the officers would have created "a reasonable doubt that did not otherwise exist." [36] It has not been established that the solicitor had the officers' reports in his files before the trial, but he obviously had the autopsy report. As this court earlier observed, however, the presence of the officers' reports in police files constructively placed them in the hands of the prosecutor,[37] so the solicitor should have been aware of their existence. With such legal awareness, the possible link between the reports of hearsay about the age of the bruises on the victim's arms became inextricably entwined with the autopsy report, where the histological protocol raised a question of the time when the bruise on the right arm occurred. This development tends to merge the two basic reports into a homogeneous package of *Bra-* *dy* material which blurs the distinction between them under *Agurs* as to their respective materiality. As a composite, the withheld material might well have created a reasonable doubt in the minds of jurors who deliberated thirty-two hours without knowledge of its existence before finding the petitioner guilty, and, *a fortiori,* the composite evidence, if known to the jury, and properly utilized by petitioner's defense attorneys, might have affected the outcome of the trial.[38]

For the foregoing reasons, as well as those advanced in the magistrate's report, this court again directs that petitioner's conviction be set aside, and that the State of South Carolina be granted the option to retry him, if the State so chooses. However one may evaluate petitioner's personal conduct, as revealed in the record of his trial and the record assembled here in the prior habeas corpus case, this court has concluded that he was deprived of a fair trial under the due process standards laid down in controlling federal cases. Faithful adherence to these standards calls for a high price on occasions. Some guilty criminals go free and, despite all constitutional safeguards, some innocent persons are convicted. Petitioner's category is known only to him, but his innocence or guilt in the death of his wife is presently in issue only to the extent that the collective wisdom of a jury of his peers might have been affected by an inadvertent error of law committed by a conscientious prosecutor in 1965, which went undetected for several years because of a less obvious error by equally conscientious defense attorneys who represented him with great fidelity. Eleven years of an innocent man's life, or the expungement of a conviction of a killer of another human being, is a

---

**36.** The dual materiality standards are involved because the autopsy report was specifically requested, whereas the officers' reports were requested only under the general request of petitioner's attorneys for any evidence having the character of exculpatory material, a too-broad request under *Agurs.*

**37.** Hrg.Tr. at 420, Tr.Rec. at 224, *citing Barbee v. Warden, Maryland Penitentiary,* 331 F.2d 842 (4th Cir. 1964).

**38.** Respondents have argued the necessarily speculative nature of such a finding. *See United States v. Keogh,* 316 F.Supp. 921 (S.D.N.Y. 1970), *aff'd.,* 440 F.2d 737 (2nd Cir. 1971). But such finding here, it is submitted, would not be "too dogmatic." *See Levin v. Clark,* 408 F.2d 1209, 1212 (D.C.Cir.1967), *citing Griffin v. United States,* 183 F.2d 990, 993 (D.C.Cir.1950).

high price to pay for a legal error, but one of these alternative premiums may have been paid, or must be paid, in this case.

AND IT IS SO ORDERED.